The **INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA,**
Plaintiff–Appellee,

v.

**CONTINENTAL NATIONAL INDEMNITY COMPANY,**
Defendant–Appellant.

No. 99–4347.

United States Court of Appeals, Sixth Circuit.

March 28, 2001.

Before BOGGS and MOORE, Circuit Judges, and BELL,* District Judge.

OPINION

MOORE, Circuit Judge.

Plaintiff–Appellee, the Insurance Company of the State of Pennsylvania ("ISOP"), initiated this lawsuit against Defendant–Appellant, Continental National Indemnity Company ("CNI"), to recover money that it paid for damages caused by its insureds, L&S Trucking ("L&S"), the owner of a tractor-trailer that was leased to Brandt Trucking, Inc. ("Brandt"), a trucking company insured by CNI; Wayne Campbell, a truck driver employed by L&S; and Intrenet, Inc. d/b/a Advanced Distribution Systems, Inc. ("ADS"), a trucking company that had entered into a sublease to use L&S's tractor-trailer for one return trip during the term of the Brandt–L&S lease. The district court granted summary judgment in favor of ISOP, holding that ISOP could recover $1,000,000 from CNI to offset the amount already paid in settlement.

CNI now appeals the district court's decision. For the reasons that follow, this court AFFIRMS the district court's judgment.

I.   BACKGROUND[1]

This case arises out of an accident that occurred during a return trip by Campbell

---

* The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

1. These facts are drawn primarily from the parties' Joint Stipulation of Facts. Joint Appendix ("J.A.") at 22–36.

on Saturday, March 9, 1996. On March 8, 1996, Campbell hauled a load of goods from Mars, Pennsylvania, to Gary, Indiana, for Brandt in accordance with the permanent lease Brandt had entered into for the use of a tractor-trailer owned by L&S.

The Brandt–L&S lease (the "lease") provides that L&S will lease a 1991 Peterbilt conventional tractor, serial no. MN310606N, Oklahoma license plate no. 1HT627 (the "tractor-trailer"), to Brandt for use in its business. Under the lease, Brandt agrees to assume "exclusive possession, control, use and complete responsibility for operation" of the tractor-trailer "in the transportation of property for hire" for the duration of the lease. Joint Appendix ("J.A.") at 26 (quoting "Equipment and Service Agreement Between Owner and Carrier," J.A. at 34 at ¶ 2). The term for this lease is as follows:

3. Term. Except for [L&S's/Campbell's] sublease (aka trip lease) interruption(s) as provided in paragraph 13 below, this agreement shall commence on the effective date and hour specified below [February 29, 1996] and continue in effect until breached by either party or until terminated. If this agreement is ... (2) for multiple trips it shall be terminated by mailing or delivering to the other party ... two copies of a written notice of termination which shall be effective either upon receipt ... or at such later date as may be specified in that notice.... Without excluding other breaches, any failure to furnish equipment or any use of equipment by [L&S/Campbell] or by any person other than [Brandt] prior to termination is a specifically designated breach of this agreement which prevents and therefore terminates [Brandt's] exclusive possession, control, use and complete responsibility for said EQUIPMENT and in such event, this agreement is automatically terminated. Termination automatically

constitutes a return of EQUIPMENT by [Brandt] to [L&S Campbell].

J.A. at 26 (quoting "Equipment and Service Agreement Between Owner and Carrier." J.A. at 34 at ¶ 3).

The lease also requires Brandt to furnish identification for the tractor-trailer, "display such identification thereon in the manner required by [Brandt] and all applicable laws or regulations," and maintain liability insurance for the protection of the public. J.A. at 27–28 (quoting "Equipment and Service Agreement Between Owner and Carrier," J.A. at 34–35 at ¶¶ 7, 9). Finally, the lease requires L&S to obtain liability insurance for the periods when the tractor-trailer is not being operated for the services of Brandt and permits L&S to sublease or "trip lease" the tractor-trailer as follows:

13. Assignment and Subleasing. Neither party may assign this lease, [L&S/Campbell] acting on his own behalf, and not on behalf of [Brandt], may sublease (aka trip lease) EQUIPMENT when permitted by applicable laws or regulations. [L&S/Campbell] shall be considered as lessor in any such sublease. During any such sublease, [Brandt's] exclusive possession, control, use and complete responsibility under this lease shall be interrupted and completely eliminated and shall remain in that status until reinstated by the completion of [L&S/Campbell's] sublease. [L&S/Campbell] shall pay [Brandt] ___% of the revenue derived from [L&S/Campbell's] sublease where [Brandt's] trailer is being pulled by [L&S/Campbell's] tractor. Any other type of subleasing arrangement is unauthorized. If [L&S/Campbell] enters into an unauthorized sublease, [L&S/Campbell] and his unauthorized sub-lessee agree to assume all responsibility for and hold [Brandt] harmless from any claims whatsoever whether for public liability, property damage, cargo loss or

otherwise. [Brandt] shall not be required to pay anything to [L&S/Campbell] in connection with any sublease. J.A. at 28–29 (quoting "Equipment and Service Agreement Between Owner and Carrier," J.A. at 36 at ¶ 13).

After delivering the load for Brandt on March 8, 1996. Campbell contacted Brandt several times to make arrangements to receive a load to carry on his return trip. Because Brandt did not have any loads for Campbell to carry on a return trip, Campbell, on behalf of his employer L&S, entered into a trip lease with ADS to transport steel coils from Acme Steel Company in Riverdale, Illinois, to Ames Company ("Ames") in Parkersburg, West Virginia. As the ADS load was not due for delivery until March 11, 1996, Campbell planned to drive the load to his home in Wellsburg, West Virginia, which was about an hour and a half away from Ames; spend Saturday and Sunday nights at home; and then deliver the load to Ames on March 11, 1996.

At approximately 3:38 p.m. on March 9, 1996, Campbell was driving behind three other tractor-trailers on U.S. Route 30 in Ohio, when the preceding tractor-trailers stopped to yield to another vehicle on the road. According to Campbell, because the brake lights of the tractor-trailer in front of him were not working, he did not realize that the traffic ahead of him had yielded until it was too late to stop without rear-ending the tractor-trailer. In an effort avoid a collision with the tractor-trailer in front of him, Campbell turned left into oncoming traffic. Unfortunately, this quick turn caused Campbell immediately to collide head-on with a 1993 BMC Autoform passenger van, killing the van's five occupants. At the time of the accident, the ICC placards on display on the tractor-trailer were from Eastern Express, Inc.; Campbell testified that he never received placards from Brandt or ADS to place on the tractor-trailer during the deliveries he performed or attempted to perform for them on March 8 and 9, 1996, respectively.

After the fatal accident, three separate lawsuits were filed in state court against ADS, Eastern, Brandt, L&S, and Campbell. Several months later, there was a settlement in all three lawsuits, which was funded entirely by ADS's primary and excess insurers, Zurich–American Insurance Company ("Zurich") and ISOP. CNI and its insured Brandt did not pay any money toward the settlement. The amount paid by ISOP in the settlement exceeds the one million dollars it seeks to recover from CNI, which is the maximum amount for which Brandt was insured under CNI's policy for losses due to accidents.

The administrators of the decedents' estates executed an Assignment and/or Subrogation Agreement in favor of ISOP against Brandt and CNI, and ISOP filed this action against CNI, ISOP seeks to have CNI assume the status of excess insurer for these parties. ISOP believes that ADS, Campbell, and L & S were also insured under the primary policy of insurance issued by CNI for Brandt. The CNI policy provides that CNI "will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an accident and resulting from the ownership, maintenance or use of a covered 'auto.'" J.A. at 51. In relevant part, the policy defines "insureds" as follows, with a few exceptions:

a. You [Brandt] for any covered "auto";

b. Anyone else while using with your permission a covered "auto" you own, hire or borrow....

J.A. at 51. The policy lists "hired autos" as "covered autos" under the agreement, defining "hired autos" as "those 'autos' [Brandt] lease[s], hire[s], rent[s] or borrow[s]." J.A. at 50.

## II. ANALYSIS

■ CNI argues that the district court erred in granting summary judgment in favor of ISOP because ISOP's insureds were not entitled to coverage under the CNI policy. We review de novo a district court's grant of summary judgment. *Affiliated FM Ins. Co. v. Owens–Corning Fiberglas Corp.*, 16 F.3d 684, 686 (6th Cir. 1994). Summary judgment is proper only when there is no dispute as to a material question of fact and one party is entitled to a judgment as a matter of law. *Id.* (citing FED. R. CIV. P. 56(c)).

■ Ohio courts construe insurance policies under the same rules and principles that apply to other written contracts. *Id.* at 686 (citing *Rhoades v. Equitable Life Assurance Soc'y*, 54 Ohio St.2d 45, 374 N.E.2d 643, 644 (Ohio 1978)). "The purpose of contract construction is to effectuate the intent of the parties." *Kelly v. Medical Life Ins. Co.*, 31 Ohio St.3d 130, 509 N.E.2d 411, 413 (Ohio 1987). Therefore, in construing an insurance policy, a court must consider the subject matter and purpose of an agreement and must give meaning to every paragraph, clause, phrase, and word. *Affiliated FM*, 16 F.3d at 686. In so doing, "[a] court must give undefined words used in an insurance contract their plain and ordinary meaning." *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 652 N.E.2d 684, 686 (Ohio 1995). "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." *Kelly*, 509 N.E.2d at 411 (Syllabus ¶ 1). "Exclusions or exceptions must be expressly provided or must arise by necessary implication from the policy language." *Ambrose v. State Farm Fire & Cas.*, 70 Ohio App.3d 797, 592 N.E.2d 868, 870 (Ohio Ct.App.1990). The court should not look to evidence outside of the policy where the contract is clear and unambiguous. *Kelly*, 509 N.E.2d at 413. If the policy language is ambiguous and if such language was prepared by the insurer, then the contract must be construed liberally in favor of the insured and strictly against the insurer. *United States Fid. & Guar. Co. v. Lightning Rod Mut. Ins. Co.*, 80 Ohio St.3d 584, 687 N.E.2d 717, 719 (Ohio 1997).

■ After reviewing the language of the CNI policy in accordance with Ohio law, we conclude that ADS, L&S, and Campbell satisfy the three requirements necessary to be "insureds" under the CNI policy. Specifically, we conclude that ADS, L&S, and Campbell were insureds under the CNI policy for the accident that occurred on March 9, 1996 because (1) ADS, L&S, and Campbell used the tractor-trailer with Brandt's permission; (2) the tractor-trailer driven by Campbell on March 9, 1996, was a "covered auto" as defined under the CNI policy; and (3) the tractor-trailer driven by Campbell on March 9, 1996, was a covered auto that was "hired" by Brandt as that term is defined in the CNI policy.

### A. Permission

CNI argues that the district court erred in concluding that ADS, L&S, and Campbell were operating the tractor-trailer with Brandt's permission on March 9, 1996, because the lease between Brandt and L&S was interrupted and completely eliminated by the trip lease or sublease between ADS and L&S.[2] We disagree.

The district court correctly concluded that the Brandt–L&S lease was not inter-

---

**2.** The district court noted:

All that is interrupted by any trip lease is Brandt's *"exclusive* possession, control, use and *complete* responsibility[.]" ... Under the Brandt Lease, Brandt always has the exclusive right to possess, control and use the tractor-trailer. In that event, it would have complete responsibility for the rig. If, and only if, Brandt has no need for the tractor-trailer on a return trip, is Camp-

rupted and completely eliminated by the ADS trip lease. As the district court explained, under the plain language of the policy, only Brandt's *"exclusive* possession, control, use and *complete* responsibility" were interrupted and eliminated by the ADS trip lease, not the lease itself.

In fact, when meaning is given to every paragraph in the policy, it is clear that the Brandt–L&S lease was not interrupted at the time of the accident. For example, paragraph 13 provides that L&S shall pay Brandt a certain percentage of the revenue derived from the sublease if Brandt's trailer is being pulled by L&S's tractor and thus suggests that the lease continues even during an interruption by a · sublease. Otherwise, L&S's promise to pay part of the revenues of certain subleases would be meaningless, as L&S would not be bound to honor it under a "terminated" lease. Paragraph 13 also provides that L&S must "agree ... [to] hold [Brandt] harmless from any claims" *but only* when L&S "enters into an *unauthorized* sublease," thereby implying that Brandt must assume at least some responsibility for claims brought as a result of events occurring during the terms of authorized subleases. Finally, paragraph 7 provides that "[Brandt's] identification automatically becomes inapplicable and shall be removed at the *termination of this Lease* and removed or concealed *during any interruption by [L&S's] sublease (aka trip lease)."* "Equipment and Service Agreement Between Owner and Carrier," J.A. at 34, 36 at ¶¶ 7, 13. As ISOP pointed out in its brief, "[t]here would have been no need to refer to an 'interruption' if the trip lease acted as a 'termination' of the lease during the trip lease." ISOP Brief at 35.

In essence, it appears that, when there is an authorized L&S sublease, Brandt's possession, control, use, and responsibility for the use of the tractor-trailer under the lease are only *modified,* not terminated. Thus, in the absence of any evidence showing that the Brandt–L&S lease was terminated by the notice required under the lease, we conclude that the lease was still in effect at the time of the accident on March 9, 1996. *Cf. Canal Ins. Co. v. Brogan,* 93 Ohio App.3d 765, 639 N.E.2d 1219, 1223–24 (Ohio Ct.App.), *appeal denied,* 70 Ohio St.3d 1428, 638 N.E.2d 89 (Ohio 1994), 71 Ohio St.3d 1480, 645 N.E.2d 1259 (Ohio 1995) (holding that the permanent lessee was responsible for the return trip of a driver even though the driver was free to contract with another company on his return).

Consequently, we hold that ADS, L&S, and Campbell had permission from Brandt to operate the tractor-trailer to deliver goods for ADS during Campbell's return trip. The Brandt–L&S lease expressly permits L&S to sublease the tractor-trailer on its own behalf and does not require L&S to receive approval for each individual sublease. Reading the CNI policy as a whole and in its plain and ordinary meaning, we conclude that ADS, L&S, and Campbell were operating the tractor-trailer on March 9, 1996 with Brandt's permission pursuant to the Brandt–L&S lease.

## B. Covered Auto

CNI further argues that the tractor-trailer was not a "covered auto" under the CNI policy because the Brandt–L&S lease was interrupted and completely eliminated

---

bell/L&S authorized to enter into a trip lease. In that event, Brandt's possession, control, use and responsibility are all modified, but not eliminated. As the *Gilstorff* court made clear, as long as the permanent lease is in place, Brandt retains some liabil-

ity. The permanent lease remains intact until it ends by its own terms or until someone breaches it.
J.A. at 151 (D.Ct.Mem.Op.) (interpreting *Gilstorff v. Top Line Express Inc.,* 910 F.Supp. 355 (N.D.Ohio 1995)).

by the trip lease or sublease between ADS and L&S. The CNI policy provides coverage for "hired autos," and the policy defines "hired autos" as those autos *leased*, hired, rented, or borrowed by Brandt. As we explained above, Brandt was leasing the tractor-trailer under the L&S lease at the time of the accident. Therefore, the tractor-trailer was a "leased" or "hired auto" as defined in the CNI policy.[3]

C. Covered Auto That Brandt Owns, Hires, Or Borrows

Finally, CNI argues that the tractor-trailer was not a "covered auto" that Brandt owned, hired, or borrowed as defined under the CNI policy because the lease between Brandt and L&S was interrupted and completely eliminated by the trip lease or sublease between ADS and L&S. The CNI policy specifies that a "hired auto" is an auto *leased, hired*, rented, or borrowed by Brandt. Given our conclusion that the tractor-trailer was a hired or leased auto under the policy, we hold that the tractor-trailer was a covered auto that Brandt *hired or leased.*[4]

## III. CONCLUSION

We hold that the district court did not err in deciding that ISOP's insureds, specifically Brandt, L&S, and Campbell, were covered under the CNI policy because such insureds used the tractor-trailer, a covered auto that Brandt hired, with Brandt's permission on March 9, 1996. Consequently, we AFFIRM the district court's judgment.

---

3. The fact that the tractor-trailer was not being used for a Brandt delivery at the time of the accident does not alter its status as a covered auto. The CNI policy did not explicitly or necessarily limit coverage to only those claims where an auto was being used for a Brandt delivery, nor did it exclude coverage where an auto was both leased or hired by Brandt and simultaneously subleased by L&S. *See National Union Fire Ins. Co. v. Shane & Shane Co.*, 78 Ohio App.3d 765, 605 N.E.2d 1325, 1329 (Ohio Ct.App.1992) (providing that an insurance policy must be construed against the insurer if it is silent as to an exclusion). As we specified earlier, unless exclusions arise by necessary implication, they cannot be read into an insurance policy. *See Ambrose,* 592 N.E.2d at 870.

4. Even if we were to conclude that the policy does not define the term "hire" because such term was not intended to have the same meaning as the term "hired" in "hired auto," we would still conclude that the tractor-trailer is a covered auto that Brandt *hired* under the plain meaning of the term. "Random House Unabridged Dictionary" defines "hire" as "employ" or "lease." Additionally, it provides: "HIRE is ... also used in reference to paying for the temporary use of automobiles." RANDOM HOUSE UNABRIDGED DICTIONARY 906 (2d ed. 1993). Under the Brandt–L&S lease, Brandt was "leasing" or "paying for the temporary use" of L&S's tractor-trailer. In other words, when the words of the policy are given their plain or ordinary meaning, it is clear that Brandt was hiring the tractor-trailer at the time of the accident.